**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Dorothy Mae Brooks-Mills, | ) | Civil Action No. 3:17-cv-01849-JMC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Lexington Medical Center; Tod Augsburger, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Dorothy Mae Brooks-Mills filed this action against her former employer, Defendant Lexington Medical Center ("LMC"), and its president and chief executive officer, Tod Augsburger, (together "Defendants") alleging violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634, and 42 U.S.C. § 1981. (ECF No. 79.)

This matter is before the court on Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 111.) In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02(B)(2)(g) (D.S.C.), the matter was referred to a United States Magistrate Judge for pretrial handling. On January 16, 2020, the Magistrate Judge issued a Report and Recommendation in which she recommended that the court grant Defendants' Motion for Summary Judgment as to all of Plaintiff's claims. (ECF No. 116 at 13.) Plaintiff filed Objections to the Report and Recommendation, which are presently before the court. (ECF No. 118.) For the reasons set forth below, the court **ACCEPTS** the Magistrate Judge's recommendation, **GRANTS** Defendants' Motion for Summary Judgment, and **OVERRULES** Plaintiff's objections.

## I.    RELEVANT BACKGROUND TO PENDING MOTION

The facts of this matter are discussed in the Report and Recommendation.  (*See* ECF No. 116 at 1–3.)  The court concludes, upon its own careful review of the record, that the Magistrate Judge's factual summation is accurate and incorporates it by reference.  The court will only reference herein additional facts viewed in the light most favorable to Plaintiff that are pertinent to the analysis of her claims.

"LMC is a nearly 400-bed medical complex that anchors a network of community medical centers, urgent care centers, an occupational health center, the largest extended care facility in the state [of South Carolina], and an Alzheimer's care center."  (ECF No. 111-1 at 2.)  On June 6, 2006, Plaintiff began working for LMC as an environmental services assistant at its Irmo, South Carolina location.  (ECF No. 111-2 at 5/18:19–24, 5/20:10–12, 6/23:25–24:2, 6/24:20–24.[1])  Plaintiff was primarily responsible for cleaning and maintaining the urgent care area.  (ECF No. 111-2 at 7/27:23–28:2.)  However, she was sometimes "assigned to surgery because she had all of the necessary training to work in that area."  (ECF No. 111-9 at 2 ¶ 4.)  During the times relevant to this action, LMC employed four (4) environmental services assistants: Plaintiff, "a black female; Lillie Wages, a black female; Martha (Marty) Sigler, a white female; and Kennedy Martin, a black male."  (ECF No. 111-8 at 1 ¶ 3.)  The environmental services assistant position was a direct report to the Director of the Irmo facility.  (ECF No. 111-2 at 6/21:2–4.)

Starting in at least May of 2014, Plaintiff started complaining about her workload.  As a result of the way she conveyed her complaints to the Director, Plaintiff received a written warning for insubordination on May 15, 2014, and a "does not meet expectations" finding regarding her

---

[1] The court observes that the docket contains condensed transcripts with 4 pages of testimony on each page. Therefore, the number before the slash is the ECF page number and the number after the slash is the transcript page number.

communications skills on an Employee Performance Evaluation dated October 7, 2014. (ECF

Nos. 111-8 at 7, 111-2 at 49.) Thereafter, in a letter dated February 16, 2015, Plaintiff raised the

following complaints to LMC's Human Resources ("HR"):

> TO ALL THIS DOCUMENT SHOULD CONCERN; I DOROTHY BROOKS
> 52YRS OLD HAVE BEEN EMPLOYED WITH LEXINGTON MEDICAL
> CENTER IRMO SINCE JUNE 05, 2006. I TAKE MY POSITION AS
> ENVIRONMENTAL SPECIALIST SERIOUSLY AND CONSIDER MYSELF A
> TEAM PLAYER. FROM THE BEGIN[N]ING OF MY EMPLOYMENT I WAS
> TOLD THAT THE FACILITY WAS UNDER STAFFED; BUT ADDITIONAL
> HELP HAS NEVER COME, IN FACT I HAVE BEEN INCUMBERED WITH
> EVEN MORE SPACE AND WORK LOAD OVER THE YEARS, ENTER MS.
> LAURA LOTT, FACILITY ADMINISTRATOR, I AM NOW TREATED LIKE
> "THE HELP" NOT A BONAFIDE EMPLOYEE. SHE WILL WALK BY ME IN
> A LON[EL]Y HALLWAY AND NOT SPEAK EVEN IF JUST OUT OF THE
> COURTESY OF CORDIAL ACKNOWLEDGMENT THIS IS INTIMIDATING
> IN ITSELF, WHEN MS. LILLIAN WAGES AND OR I WOULD APPROACH
> WITH ISSUES CONCERNING THE FACILITY AND FUNCTIONS OF DAILY
> WORK ACTIVITY WE WERE OFTEN THEN AND NOW, STILL TREATED
> WITH TOTAL DISREGARD AND THE DIGNITY OF RESPECT FOR WHAT
> I AM TRYING TO CONVEY TO HER. MS. LOTT[] WILL OVER TALK
> WHAT IS BEING STATED IMMEDIATELY FOR HER OWN POINT OF
> VIEW, NO MATTER WHAT THE SUBJECT. IN JULY 24, 2014 I WAS TOLD
> I WOULD HAVE TO WORK TWO DAYS FOR MARTY IN SURGICAL AS
> WELL AS MY DAILY RESPONSIBILITIES IN URGENT CARE, I WAS
> FORCED WITH THIS PHYSICAL AND EM[]OTIONAL BURDEN OF DOING
> MARTY[']S JOB AS WELL FOR 6 MONTHS AT TIMES FEELING AS
> THOUGH I WOULD COLLAPSE IN BOTH WAYS, I HAVE HAD A TOTAL
> KNEE REPLACEMENT 2 YEARS AGO, IN SEPTEMBER 2014 MY KNEES
> BEGAN TO CHRONICALLY ACHE, I WENT TO MY ORTHOPEDIST. I
> APPROACHED MS. LOTT ABOUT THE REPLACEMENT FOR MARTY, SHE
> STATED "A COUPLE OF WEEKS, AND WE SHOULD HAVE SOME HELP"
> I WAS FORCED TO WORK URGENT CARE AND SURGICAL AREA
> DOWNSTAIRS FOR 6 MONTHS, WITH A TREMENDOUS TOLL TO MY
> MIND AND BODY. LILLIAN WAGES, WHOM ALSO HAD A TOTAL KNEE
> REPLACEMENT, RETIRED EARLY AS A RESULT OF LAURA LOTT[']S
> TREATMENT AND STATED SO TO MYSELF AND OTHERS, WAGES
> STATED," SHE IS NASTY AND DISRE[S]PECTFUL AND YOU CAN NOT
> APPROACH HER, I DON'T HAVE TO TAKE THIS I'M LOOKING INTO
> RETIRING" SHE RETIRED IN DECEMBER AFTER MAKING THIS
> STATEMENT TO ME AND MY HUSBAND IN SEPTEMBER WAGES AND
> MYSELF ARE NATIVE AND AFRICAN AMERICAN, THE SURGICAL
> PERSON IS CAUCASI[A]N. I AM NOW BEING TOLD THAT DAILY I AM
> TO HELP HER PERFORM HER DUTIES THAT SHE HAS BEEN

RESPONSIBLE FOR SINCE HER EMPLOY[]MENT. MY 87 YR. OLD MOTHER WHO HAS NEVER BEEN SICK OR IN THE HOSPITAL, WAS ON THE WAY TO THE MAIN CAMPUS E.R., I ASKED LAURA LOTT IF I COULD LEAVE EARLY, SHE STATED "YOU CAN LEAVE WHEN YOU GET DONE WITH YOUR WORK" I WAS AT MY SCHEDULED BREAKTIME WHEN I TOLD HER ABOUT MY MOTHER, AND WHEN I CAME OUT TO THE AREA WHERE I WAS TO CONTINUE MY WORK SHE WAS IN THAT AREA AND SAW A PIECE OF TRASH ON THE FLOOR AND WENT INTO A T[I]RA[D]E AND STATED, "THIS PLACE IS GOING DOWN!" AND AS I MADE ACTIONS TO CLEAN UP, SHE THEN STATED IN A VERY S[E]RVILE TONE," DIDN'T I TELL YOU TO GO HELP MARTY!" I BECAME VERY NERVOUS AND ALMOST TO TEARS AS I BECAME CONFUSED AS TO WHAT I SHOULD BE DOING CLEANING MY AREA OR HELPING MARTY CLEAN HERS. IN REGARDS TO MY MOTHER SHE HAD STATED, "YOU ALWAYS HAVE SOMETHING GOING ON" I AM OFFENDED AT THIS STAT[E]MENT, BUT FOR THE READER, I LOST A BROTHER IN NOVEMBER 2014 TO CANCER, MY FATHER HAS CANCER, AND MY MOTHER HAS SEVERELY ULCERATED STOMACH[], AND I HAVE ONLY TAKEN THE THREE GRIEVING DAYS. LATER JEANNE, HEAD NURSE, PULLED ME INTO HER OFFICE AND TOLD ME SHE OVER HEARD LAURA LOTT'S ANGRY ADDRESS OF ME, SHE STATED, "I KNOW YOU CAN[']T BE HAPPY WITH THE WAY SHE IS TREATING YOU, BUT IF YOU WANT TO STAY HERE YOU ARE GOING TO BE A DOOR MAT[] AND EAT SOME CROW, I'M NOT TELLING YOU WHAT TO DO, BUT TO STAY HERE IT IS WHAT YOU MUST DO", "LAURA RUNS A DIFFERENT SHIP THAN MOST". I HAVE MORE THAN 30+ YEARS EXPERIENCE AT WHAT I DO, LILIAN WAGES DID ALSO, MS. LOTT IS SEEMINGLY INEPT AT UNDERSTANDING FACILITY CUSTODIAL MAINT[E]NANCE AND ASEPTIC CLEANING, I ON THE OTHER HAND HAVE CO-OPERATED A MAID/MAINT[E]NANCE SERVICE (SUPERMAID SERVICES OF AMERICA). I SHOULD NOT HAVE TO LEAVE THIS FACILITY TO FIND REPRIEVE OR RELIEF FROM LAURA LOTT'S SEEMINGLY BLATANT DISREGARD OF OTHERS SHE CONSIDERS TO BE IN A LOWER SOCIAL STATION AS IT WERE. EVEN HER ACTIONS ARE RACIALLY BIASED NO MATTER THAT HER FATHER IS A MAN OF HONOR, VALOR AND STATURE IN THE BLACK COMMUNITY. I AM STILL UNDERGOING PHYSICAL AS WELL AS EM[]OTIONAL DIFFICULTIES FROM THE D[I]SPAR[A]T[]E TREATMENTS I HAVE RECEIVED IN THE PAST AS WELL AS THE PRESENT; ESPECIALLY WHEN MY EMPLOY[]MENT IS SEEMINGLY IN MS. LOTTS['] HANDS, MY ESTEEM HAS SUFFERED AT HER LACK OF PROFESSIONAL SUPERVISION, AND TO THIS DAY I'VE GOTTEN NO COMPLIMENTS OR THANKS FOR ALL MY EXTRA EFFORTS FROM HER, BUT EVERYONE ELSE EVEN THE DOCTORS HAVE SAID THE WORK LOAD WAS TOO MUCH FOR ONE PERSON BUT THAT I WAS DOING A GREAT JOB. LAURA LOTT ALSO STATED IN A RECENT MEETING, "IF YOU DON'T LIKE IT HERE YOU CAN GO SOMEWHERE

ELSE", I FEEL THIS STATEMENT WAS SPECIFICALLY AIMED AT ME; HER PAST ACTIONS MADE THAT CLEAR, THE STATEMENT WAS INAPPROPRIATE AND UNPROFESSIONAL, MOREOVER, WHY WAS IT MADE IN A SEVEN PERSON GROUP. FURTHERMORE I WISH NOT TO BE RIDICULED ANYMORE IN THE PRES[]ENCE OF RHONDA, PATTI, JEANNE AND OTHERS BY MS. LOTT, I ALSO WISH NO RETALIATION TOWARDS ME IN THIS REPORTING BUT I PRAY RESOLUTION AT THE PROPER LEVEL AND THESE TRUTHS WITH WIT[]NESSES, BE DEALT WITH INTEGRITY AND SINCERITY. ONE POOR EVALUATION THE ONLY ONE IN MY LIFE EVER; FROM LAURA LOTT; "STATING YOU AND LILLY HAVE BEEN COMPLAINING TOO MUCH ABOUT BEING TIRED AND HURTING". I DID NOT RECEIVE A COPY TO THIS DAY AND THESE ARE JUST A FEW OCCUR[R]ENCES OF A LOT OF MAL-TREATMENTS SHE HAS ADMINISTERED, THERE ARE MANY MORE, AND I AM BEGGING RELIEF FROM THESE EGREGIOUS TREATMENTS. THE TRUTHS SO HELP ME GOD.

(ECF No. 111-2 at 38–41 (verbatim).) On March 31, 2015, LMC's HR communicated to Plaintiff that it had reached the following conclusions in response to her complaints:

- Interviews confirm that you were asked to help out in the surgery area while an employee was out on a 5[-]month medical leave of absence. The three other EVS specialists took over extra duties as well during this time. There is no evidence supporting you having a larger workload than any of the other EVS specialists.

- There is no evidence to support the concern of employees being treated differently because of race.

- Interviews confirm that the workload is labor intensive but fairly distributed among the EVS employees.

- Majority of interviews indicate that Director Lara Lott is approachable and respectful.

- Interview[']s findings indicate that expectations arc different than previous director, however staff report that expectations are reasonable and clear.

(ECF No. 111-2 at 42.)

On July 25, 2016, Plaintiff handed the following letter to then Director Theresa Falcone:

To whomever and all this letter may concern; at this point more specifically Theresa Falcone, Facility Dir. Lex. Med. Center, Irmo. I Dorothy [B]rooks Mills in February 2015 wrote Lexington Medical Center informing human resources of the mistreatment and workplace abuse that I was undergoing for more than 6mths[] doing the work of [] three people everyday 5 days a week, my body has suffered immensely from the over exertion of doing 3 cleaning staff positions within the same shift. The work is not nor has it ever been equally distributed among the EVS

staff and in the last almost 2yrs my already overloaded work load has continued due to hiring of unreliable EVS staff replacements that have poor attendance records and performance, I can make this assertion due [to] the fact that I have supervised and co[-]operated a professional cleaning services and have cleaned for 40 years.  I am disturbed literally by the texts and phone calls that I get after hours informing me of EVS staff that is not reporting in for the next day and these type of communications disturb me as that I cannot sleep due [to] dreading the next day doing two or 3 EVS staff duties in one shift.  As well you know I need 2 knee replacement(s) one having failed in recently, I don't complain about them continually and definitely not to you though we have discussed my knees, the statement that was made on 7/13/2016 "Some people are saying you're either sick all the time, in the breakroom or on the phone" [w]as inappropriate to say the least. In the meeting on approx. 7/08/2016 you stated EVS staff, Marty needs another person in her area and I would agree but when I fill in regularly for her no HELP is afforded me and I'm given a list of extra things to do, as well you know I gave you a copy of one of such lists to bring the area up, I also am held responsible for my assigned area as well in the same shift.  In the same meeting you stated inappropriately in front of others nearing the end of meeting" let me hurry and wrap the meeting up, Ms. Dorothy's husband has to pick her up" I felt si[ng]led out demeaned and taunted and the brunt of some joke between you, Jeanne and Rhonda[.]  Actually I was humiliated to say the least, since Jeanne Dunn and Rhonda Livingston have seeming personal issues with me since my letter of 2015. There are many other issues that I observe that are biased in many ways including your employee of the quarter award.  Please place a copy of this letter in my person[n]el file.

(ECF No. 111-9 at 6 (verbatim).)  Falcone read the letter and spoke with Plaintiff about its content

because her complaints were new information to Falcone and/or involved events that had occurred

prior to Falcone becoming Plaintiff's supervisor.  (ECF Nos. 111-9 at 2 ¶ 5, 111-3 at 9/24:3–12.)

Falcone decided she needed to get HR involved so she arranged a meeting for July 28, 2016,

between herself, Plaintiff, and Laura Ziel of LMC's HR.  (ECF Nos. 111-9 at 2 ¶ 6, 111-2 at

19/73:8–74:23.)  Plaintiff provided Ziel with a copy of the letter she gave Falcone and another

letter dated July 27, 2016, which stated as follows:

To all this notice may concern: On the day of July 25, 2016 in the 1500hr.  I Dorothy M. Brooks Mills, took to Theresa Falcone a letter informing of some of the situations that have occurred on her watch and charge as director of Lexington Medical Center Irmo, some situations and oc[c]urrences have happened before up to and throughout her watch. I was off and I brought to her the letter to contemplate, she was in her office area, I advised that we should talk the next day, she insisted we should talk now after she reads this letter.  She, Theresa Falcone, then closed

the door, read the letter then became angry and irate repeatedly calling me a "LIAR! LIAR! YOU[']RE LYING!  I DON[']T REMEMBER SAYING ANY OF THAT!" Theresa Falcone then went on to intimidate and demean my character further by asking me, "Have you ever filed a workers compensation claim" I replied "No, why 'She stated,' never mind"  Theresa Falcone then went on to threaten me with HR, and that they would stand with her was her assertion and with my past experience; which past issues reported have continued to present that I would not prevail in my report.  For the record my last report in 2015 was met with a brick wall of denial and overlooking of my mistreatment and even attempted to put the blame on me as some type of complainer.  For the record I take my job personally and to heart and in past 10 years that I have been employed here I have always gotten good praise from the inspectors on my areas, but it grieves me to see some of the cleaning methods that are being implemented now.  As I have stated previously verbally and in writing I have been cleaning for 40 years it's all I know how to do and I do it to the best of my abilities and I'm always willing to learn or try new ways to clean, operative word being "clean" and I don't observe all EVS staff performing at the level to clean or keep clean the Irmo facility, as we have had in the past years. Personally I have been overlooked for continual good reports from clients and some staff co-workers intentionally trying to bring me recognition for what they consider to be above my call as EVS staff, some include employee of the period my birthday, death of my father, my 10 yr. anniversary at LMC.  After my reporting in 2015 to the heads of LMC, I notice the treatments of indifference not giving any good praises to me especially in written or award form of any kind and I purposely perform my job at the top performance level.  [S]ome EVS staff get over time for their extra efforts I do not get overtime because I'm expected to perform 2 EVS staff positions within the same shift, excuses being communications falling through cracks and such repeatedly and the extra work falling to me or if extra help does come in its to help someone else'[s] work load.  The work atmosphere has become unpleasant do to all these treatments of deference and I do not think I can continue under current circumstances and conditions.  I pray relief from the top I do not wish any further retaliatory actions or remarks, I pray GOD in the name of CHRIST, Amen . . . .

(ECF No. 111-9 at 8 (verbatim).)  On July 28, 2016, Plaintiff met with Falcone and Ziel, but the meeting ended without a resolution to Plaintiff's concerns.  (ECF Nos. 111-2 at 20/79:25–80:23, 111-9 at 2 ¶ 7–3 ¶ 9.)  Falcone tried to schedule another meeting with Plaintiff, but was unsuccessful.  (ECF No. 111-9 at 3 ¶ 11.)

On October 26, 2016, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").  (ECF No. 1 at 5; ECF No. 111-2 at 9/36:2–12.)  In the Charge, Plaintiff checked boxes to allege that she was discriminated against

because of her race, sex, and disability. (ECF No. 111-2 at 28.) Plaintiff further stated the following particulars:

> I was subjected to intimidation, disparate terms and conditions and denied a reasonable accommodation on or about July 17, 2016 through on or about September 22, 2016 and continuing. I was required to do the work of several people in an eight[-]hour shift when they were absent; in addition to the work I was assigned. Other workers (white/male) were given assistance with their tasks while I was not. I was not allowed to work overtime while other workers (white female/male) were allowed. I was not allowed to sit down to take a break. I was subjected to comments from workers saying I was always sick, in the break room or on the phone. I wrote a letter to the Facility Director advising that because of my medical condition I needed some help but was not given any. Although I complained about my treatment, no corrective action was taken. I contend I have been treated in such a manner because of my medical condition, race and in retaliation for my complaints.
>
> I therefore believe [I] have been discriminated against because of my qualified disability, race (black), sex (female) and in retaliation for my opposition to employment practices declared unlawful by SC Human Affairs Law, as amended, Americans with Disabilities Act of 1990, as amended and Title VII of the US Civil Rights Act of 1964, as amended.

(ECF No. 111-2 at 28.) On February 10, 2017, Plaintiff worked her last day for LMC. (ECF No. 111-2 at 4/16:15–19.) On February 14, 2017, Plaintiff had knee surgery and went out on medical leave. (*Id.* at 4/16:20–21, 22/87:16–23/89:3.)

After receiving notice of the right to sue from the EEOC on July 13, 2017, Plaintiff filed an action pro se in this court on that same day. (ECF Nos. 1, 1-1.) She alleged claims for retaliation and discrimination based on her race, color, gender/sex, and disability. (*Id.* at 4.) On July 21, 2017, Plaintiff's available medical leave under LMC's policy expired and she was transferred to non-working PRN status. (ECF No. 111-10 at 1 ¶¶ 2, 4.) Defendants answered the Complaint on October 20, 2017, denying its allegations. (ECF No. 25.) On October 23, 2017, the court entered a Scheduling Order. (ECF No. 27.) Pursuant to the Scheduling Order, discovery would end on February 20, 2018, and all dispositive motions were to be filed on or before March 19, 2018. (*Id.* at 1 ¶¶ 5, 6.)

8

On February 15, 2018, Plaintiff's PRN status expired, and she was terminated because of her inability to return to work.  (ECF No. 111-10 at 2 ¶ 5.)  On March 8, 2018, Defendants filed a Motion for Extension of Time to File Dispositive Motions (ECF No. 46) requesting a new deadline of April 2, 2018, which the court granted.  (*See* ECF No. 48.)  However, Defendants did not file any dispositive motion on April 2, 2018.  On April 3, 2018, the court issued an Order directing the parties to submit the status of the case, observing that "[a]s of the date of this order [April 3, 2018], no party has filed a potentially dispositive motion regarding the merits of this case."  (ECF No. 52.)  After missing the extended April 2, 2018 deadline for dispositive motions set by the court, Defendants filed another Motion for Extension of Time to File Dispositive Motions (ECF No. 54), on April 3, 2018, asking to extend the dispositive motion deadline until April 9, 2018.  The court granted Defendants' Motion without making a specified finding of excusable neglect.  (ECF No. 55.)

On April 9, 2018, Defendants filed a Motion for Summary Judgment.  (ECF No. 58.)  On April 10, 2018, the court issued a Roseboro Order to Plaintiff, granting Plaintiff until May 11, 2018 to respond to Defendants' Motion for Summary Judgment.  (ECF No. 59.)  On April 26, 2018, counsel filed a Notice of Appearance (ECF No. 69) to represent Plaintiff in this matter.  On May 11, 2018, Plaintiff filed a Motion to Amend/Correct her Complaint, a Motion to Amend the Scheduling Order, and a Motion to Stay Summary Judgment.  (ECF Nos. 71, 72, 73.)  On May 25, 2018, Defendants filed a Response in Opposition to Plaintiff's Motion to Amend Complaint and Motion to Amend Scheduling Order.  (ECF No. 75.)

On August 7, 2018, the court issued an Order granting Plaintiff's Motion to Amend the Complaint, directing Plaintiff to immediately file her Amended Complaint, but denying her Motion to Amend the Scheduling Order.  (ECF No. 78.)  In granting Plaintiff's Motion to Amend

9

the Complaint, the court found that "in the interest of justice, granting [] [P]laintiff leave to file[] an Amended Complaint is appropriate under Rule 15(a)(2)."  (ECF No. 78 at 3.)   In denying Plaintiff's Motion to Amend the Scheduling Order, the court observed that Plaintiff "has not demonstrated good cause to extend the scheduling order."  (*Id.* (citing Fed. R. Civ. P. 16(b)(4)).)  On August 8, 2018, Plaintiff filed her Amended Complaint alleging claims for race discrimination under Title VII and § 1981, sex discrimination under Title VII, § 1981 retaliation, disability discrimination and retaliation under the ADA, and age discrimination under the ADEA.  (ECF No. 79 at 6 ¶ 35–14 ¶ 84.)

On August 14, 2018, Defendants filed an Amended Motion for Summary Judgment, asserting that they were entitled to judgment as a matter of law as to all of Plaintiff's claims.  (ECF No. 81.)   Plaintiff filed a Response Memorandum in Opposition to Defendants' Motion for Summary Judgment on August 28, 2018, to which Defendants filed a Reply Memorandum in Support of Summary Judgment on September 4, 2018.  (ECF Nos. 85, 86.)  In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 D.S.C., the Magistrate Judge issued her Report and Recommendation on October 12, 2018, recommending that Defendants' Motion for Summary Judgment be granted as to all of Plaintiff's claims.  (ECF No. 93.)  On October 17, 2018, Plaintiff filed Objections to the Report and Recommendation.  (ECF No. 95.)  On March 26, 2019, the court entered an Order that denied Defendants' Motion for Summary Judgment, sustained Plaintiff's Objections, and extended the Scheduling Order to allow Plaintiff to conduct discovery.  (ECF No. 105.)

Thereafter, on October 21, 2019, Defendants filed the instant Motion for Summary Judgment.  (ECF No. 111.)  After the parties exchanged a Response in Opposition (ECF No. 113) and a Reply in Support (ECF No. 114), the Magistrate Judge entered the current Report and

Recommendation, which again recommends that the court grant summary judgment to Defendants on Plaintiff's claims.  (ECF No. 116.)  On January 30, 2020, Plaintiff filed Objections to the Magistrate Judge's Report and Recommendation.  (ECF No. 118.)  On February 13, 2020, Defendants filed a Reply to Plaintiff's Objections to the Report and Recommendation (ECF No. 119).

The court considers the merits of Plaintiff's Objections to the Report and Recommendation below.

## II.    JURISDICTION

This court has jurisdiction over Plaintiff's claims alleging violations of Title VII, the ADA, the ADEA, and § 1981 via 28 U.S.C. § 1331, as the claims arise under the laws of the United States.  Moreover, district courts are expressly empowered to hear claims brought under Title VII, the ADA, and the ADEA.  *See* 42 U.S.C. §§ 2000e–5(f)(3), 12117 & 2000e–5(f)(3), 29 U.S.C. § 633(c).

## III.    LEGAL STANDARD

A.    The Magistrate Judge's Report and Recommendation

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight.  The responsibility to make a final determination remains with this court.  *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976).  The court reviews de novo only those portions of a magistrate judge's report and recommendation to which specific objections are filed, and reviews those portions which are not objected to - including those portions to which only "general and conclusory" objections have been made - for clear error.  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005); *Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983); *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).  The court may accept, reject, or

modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions.  *See* 28 U.S.C. § 636(b)(1).

B.    <u>Summary Judgment Generally</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986).  A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).  In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).  The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).  All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 249.

## IV.    ANALYSIS

A.    <u>The Report and Recommendation</u>

At the outset of her analysis, the Magistrate Judge observed that Plaintiff's ADEA claim was "not properly before the court" because Plaintiff failed to exhaust her administrative remedies

as she was required to do under the statute. (ECF No. 116 at 6 (citing, *e.g.*, *Fort Bend Cty., Tex. v. Davis*, 139 S. Ct. 1843, 1852 (2019) (providing that failure to exhaust under Title VII is mandatory, but not jurisdictional)).) The Magistrate Judge next observed that Plaintiff's claims against Augsburger fail as a matter of law "because Title VII, the ADA, and the ADEA do not provide for causes of actions against individuals or make them personally liable." (ECF No. 116 at 7 (citing, *e.g.*, *Jones v. Sternheimer*, 387 F. App'x 366 (4th Cir. 2010) (holding that Title VII, the ADA, and the ADEA do not provide for causes of action against individuals)).)

Turning her attention to the merits of Plaintiff's claims for discrimination against LMC, the Magistrate Judge concluded that there was no evidence that Plaintiff's termination was pretextual because it occurred when she was unable to return to work after exhausting all of her available leave. (*Id.* at 9.) The Magistrate Judge further concluded that the only other adverse action identified by Plaintiff–"'unfavorable' working conditions based on an 'increased' workload"–was insufficient to establish unlawful discrimination because an inference of discriminatory treatment does not result from the reassignment of a white employee's duties to Plaintiff, a black female, when the only other person who could perform the work was a black female. (*Id.* at 9–10.) The Magistrate Judge also concluded that Plaintiff's disability discrimination claims are deficient because too much time passed between Plaintiff's knee surgery in 2013 and the reassignment of the white male's duties to Plaintiff in 2015. (*Id.*)

As to Plaintiff's claims for retaliation, the Magistrate Judge determined that Plaintiff did not suffer any qualifying adverse employment action. (*Id.* at 11.) Moreover, even if Plaintiff attempted to argue the "retaliatory creation of a hostile work environment," the Magistrate Judge observed that Plaintiff's evidence did not demonstrate treatment based on "race, gender, or disability, or . . . that the conduct was severe and pervasive." (*Id.* at 11–12.)

Lastly, the Magistrate Judge observed that because Plaintiff cannot demonstrate the merits of her Title VII claims, her claims under § 1981 fail as well.  (ECF No. 116 at 12 (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same.")).)

B.    Plaintiff's Objections

In her Objections, Plaintiff asserts that the Magistrate Judge's analysis of her ADA claim was erroneous because

> Plaintiff had knee problems, Defendants knew or had reasons to know Plaintiff's knee problems, and Plaintiff repeatedly complained about her knee problems and requested "help" through letters and verbal communication—a reasonable jury could determine that Defendants' decisions to refuse to provide reasonable accommodation to Plaintiff and continue to assign burdensome job duties to Plaintiff were based on Plaintiff's health conditions.

(ECF No. 118 at 6.)  Plaintiff asserts that she demonstrated a retaliatory adverse employment action based on "Defendants' disregard of Plaintiff's repeated requests for accommodation and continued imposition of heavy workload upon Plaintiff."  (*Id.* at 7.)  She then argues that the jury should have the opportunity "to determine whether Plaintiff's work environment unreasonably interfered with Plaintiff's work performance."  (*Id.* at 8.)  Plaintiff further argues that the Magistrate Judge wrongly assumed that Plaintiff's knee surgery was the only protected activity she engaged in when "after her knee surgery in 2012, Plaintiff continued to have pain, and accordingly, complained to Defendants about her medical conditions and requested that reasonable accommodation be provided."  (*Id.* at 8.)  Finally, Plaintiff argues that because her Title VII claims should survive summary judgment, she should be allowed to proceed to trial on her § 1981 claims.  (ECF No. 118 at 9.)

C.    The Court's Review

The court considers Plaintiff's specific objections relevant to each of her claims below.

1. *Race Discrimination under Title VII and § 1981, Sex Discrimination under Title VII, and Disability Discrimination under the ADA*

Plaintiff alleges that she suffered discrimination based on her race, sex, and disability. In this action, she has alleged claims against Defendants for violating Title VII,[2] § 1981,[3] and the ADA.[4] For each of these statutory laws, a plaintiff can establish a claim of discrimination under either by directly showing that discrimination motivated an employment decision, or, as is more common, by relying on the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Pursuant to this burden-shifting framework, the plaintiff first establishes a prima facie case of discrimination. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). Absent direct evidence, the elements of a prima facie case of discrimination under the aforementioned laws are generally: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly-situated employees outside the protected class, or there is some other evidence giving rise to an inference of unlawful discrimination.[5] *E.g.*, *Reynolds v. Am. Nat'l Red Cross*, 701 F. 3d 143, 150

---

[2] Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . ." 42 U.S.C. § 2000e-2(a)(1).

[3] 42 U.S.C. § 1981 guarantees the rights of a protected class of individuals "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, . . . ."

[4] Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §§ 12111(2), 12112(a). "Violations of the ADA occur when the employer either wrongfully discharges a qualified individual with a disability or fails to make reasonable accommodations for him." *Johnson v. Lexington Cty. Sch. Dist. Two*, C/A No.: 3:15-cv-04807-JMC, 2019 WL 5542598, at *4 (D.S.C. Oct. 28, 2019) (citing *Rhoads v. F.D.I.C.*, 257 F. 3d 373, 387 n.11 (4th Cir. 2001)).

[5] When a plaintiff proffers a circumstantial case, the elements required to establish such a case are the same under both Title VII and § 1981. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (citation omitted).

(4th Cir. 2012); *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010); *Haulbrook v. Michelin N. Am.*, 252 F. 3d 696, 702 (4th Cir. 2001); *Cason v. S.C. State Ports Auth.*, C/A No. 2:11-2241-RMG-BM, 2014 WL 588031, at *4 (D.S.C. Jan. 7, 2014) (citations omitted). "The employer may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual." *Hammett v. S.C. Dep't of Health & Envtl. Control*, C/A No. 3:10-932-MBS-SVH, 2013 WL 1316440, at *5 (D.S.C. Jan. 25, 2013) (citing *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005)). *See also Wilson v. Genesis Healthcare, Inc.*, C/A No. 4:17-cv-3318-RBH-TER, 2019 WL 3208842, at *5 (D.S.C. July 1, 2019) ("Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is 'discrimination vel non.' In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination or retaliation." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000))).

In the Report, the Magistrate Judge specified that Plaintiff only identified two (2) adverse employment actions in support of her discrimination claims: (1) her termination and (2) "'unfavorable' working conditions based on an 'increased' workload." (ECF No. 116 at 9.) Upon the Magistrate Judge's review, she determined that Plaintiff's discrimination claims fail as to her termination because no evidence supported a finding of pretext and as to the workload issue because it did not result in an inference of unlawful discrimination. (*Id.* at 9–10.) In her Objections, Plaintiff did not argue against the finding made regarding her termination, but does posit that the totality of "unfavorable working conditions, increased workloads, hostile work environment, and harassment" support inferences of discriminatory conduct by Defendants. (ECF

No. 118 at 1.)

"The presence of adverse employment action is 'an absolute precondition' to an employment discrimination suit." *Batten v. Grand Strand Dermatology, LLC*, C/A No. 4:18-cv-0616-MGL-TER, 2019 WL 9667692, at *6 (D.S.C. Dec. 20, 2019) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)). "An adverse employment action is an action 'that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Jensen-Graf v. Chesapeake Emp'rs' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (quoting *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011)). "[T]here is no exhaustive list of what constitutes an adverse employment action." *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002). "Courts have held that termination, demotion, denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions." *Id.* "While a plaintiff must show the existence of an adverse employment action to show a prima facie case of employment discrimination, this requirement 'is derived from the statute's requirement that the employer's practice relate to 'compensation, terms, conditions or privileges of employment' or that the practice 'deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee.'" *Jensen-Graf*, 616 F. App'x  at 597–98 (quoting *Ali v. Alamo Rent–A–Car, Inc.*, 8 F. App'x 156, 158 (4th Cir. 2001). To qualify as an adverse employment action, the harm alleged must "work a 'significant' detriment" on a plaintiff. *Adams v. Ann Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015).

Upon its consideration of the foregoing, the court agrees with the Magistrate Judge that Plaintiff's allegations of discriminatory conduct, whether considered individually or in totality, do not constitute an adverse employment action sufficient to support Plaintiff's discrimination claims under Title VII, § 1981, or the ADA.  In this regard, the court is unable to find that Plaintiff's complaints about "unfavorable working conditions, increased workloads, hostile work environment, and harassment" are acts by Defendants that affected the "terms, conditions, or benefits" of Plaintiff's employment to justify a finding of an adverse employment action(s).  *See, e.g.*, *Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013)  ("[I]t is well established that assignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where . . . the rate of pay and benefits remains the same.  '[A]llegations of . . . unfair work assignments, without more, do not amount to 'adverse employment actions' because they are not materially adverse changes in the terms or conditions of [the plaintiff's] employment.'" (citation omitted)).  Accordingly, because Plaintiff cannot demonstrate that she suffered an adverse employment action, the court finds that Defendants are entitled to summary judgment on Plaintiff's claims for race discrimination under Title VII and § 1981, sex discrimination under Title VII, and disability discrimination under the ADA.

### 2.  *Retaliation under § 1981 and the ADA*

To establish a prima facie retaliation claim under § 1981 or the ADA, a plaintiff "must produce evidence from which a reasonable jury could find (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action." *Honor v. Booz– Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (citing *Mackey v. Shalala*, 360 F.3d

463, 469 (4th Cir. 2004)); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997). "In order to show that a plaintiff has suffered an adverse employment action in the context of a retaliation claim, the 'plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from' engaging in the protected activity." *Cummings v. Bank of Am.*, N.A., C.A. No. 6:08-2236-HMH-BHH, 2010 WL 412549, at *8 (D.S.C. Jan. 27, 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Adverse employment actions include any retaliatory act or harassment if that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment." *Honor*, 383 F.3d at 188 (citing *Von Gunten v. Maryland*, 243 F.3d 858, 865–68 (4th Cir. 2001)). "Once the plaintiff makes this case, the employer can defend itself by producing 'evidence of a legitimate, non-discriminatory reason for taking the adverse employment action.'" *Id.* (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003)). At that point, the plaintiff has the opportunity to prove that the employer's legitimate, non-discriminatory reason is pretextual. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001) (citation omitted).

For her retaliation claims, Plaintiff relies on the same adverse employment actions she cited to support her discrimination claims: "unfavorable working conditions, increased workloads, hostile work environment, and harassment." Even under a retaliation claim's lower threshold for adverse conduct, the court is not persuaded that this conduct, either individually or collectively, constitutes an adverse employment action for purposes of Plaintiff's retaliation claims. Therefore, Defendants are entitled to summary judgment on Plaintiff's claims for retaliation in violation of § 1981 and the ADA.

### 3. *Age Discrimination under the ADEA*

In the Report, the Magistrate Judge observed that Plaintiff failed to administratively exhaust her age discrimination claim, which was not objected to by Plaintiff. (*See* ECF No. 116 at 6.) Upon its review, the court observes that in her Charge of Discrimination, Plaintiff did not allege that she was discriminated against because of her age. (*See* ECF No. 111-2 at 28.) As a result, the court finds that Plaintiff's ADEA claim exceeds the scope of her Charge and Defendants are entitled to summary judgment on this claim based on Plaintiff's failure to exhaust administrative remedies. *See, e.g.*, *Sarteh v. Youth Focus, Inc.*, Case No. 1:08CV113, 2008 WL 11355352, at *4 (M.D.N.C. Dec. 17, 2008) ("Given the fact that Plaintiff's EEOC charges alleged only Title VII claims of discrimination or retaliation for filing those claims, 'a reasonable investigation' by [] the EEOC . . . "would not have focused on age [] discrimination . . . prohibited by the . . . ADEA." (citation omitted)).

### 4. *Liability of Defendant Augsburger*

The Magistrate Judge recommended that the court dismiss Defendant Augsburger from the action because individual liability does not exist under Title VII or the ADA. (ECF No. 116 at 7.) Plaintiff did not file an objection to the Magistrate Judge's Report, but even if she did, the court would find that Augsburger is entitled to dismissal of the claims against him. Specifically, the court observes that any claims against Augsburger alleging violation of Title VII, the ADA, or the ADEA fail because he was not named in the Charge of Discrimination. *See Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998) ("Under Title VII and the ADEA, a civil action may be brought only 'against the respondent named in the charge.'" (citing 42 U.S.C. § 2000e–5(f)(1) (1994); 29 U.S.C. § 626(e))); *Brown v. Miller*, Civil No. GLR-19-3156, 2020 WL 3184144, at *3 (D. Md. June 15,

2020) ("Title VII, ADEA, and ADA lawsuits may only be brought against the parties specifically named in the underlying administrative charge." (citing *Causey*)).  Accordingly, Augsburger is entitled to summary judgment on Plaintiff's Title VII, ADA, and ADEA claims for failure to exhaust administrative remedies.

## V.    CONCLUSION

Upon careful consideration of the entire record, the court hereby **GRANTS** the Motion for Summary Judgment of Defendants Lexington Medical Center and Tod Augsburger (ECF No. 111) and **OVERRULES** Plaintiff Dorothy Mae Brooks-Mills' Objections.  (ECF No. 118.)  The court further **ACCEPTS** the Magistrate Judge's Report and Recommendation (ECF No. 116) and incorporates it herein by reference.

**IT IS SO ORDERED.**

J. Michelle Childs

United States District Judge

September 30, 2020
Columbia, South Carolina